UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

SECURITIES INVESTOR PROTECTION
  CORPORATION,

                     Plaintiff-Applicant,             Adv. Proc. No. 01-4257 RJK

v.

MJK CLEARING, INC.,

                     Defendant.

_____

## TRUSTEE'S INVESTIGATORY REPORT, FINAL REPORT AND ACCOUNT OF ADMINISTRATION OF THE ESTATE

TO THE HONORABLE ROBERT J. KRESSEL,
UNITED STATES BANKRUPTCY JUDGE

           James P. Stephenson, as trustee (the "Trustee") for the liquidation of MJK

Clearing, Inc. ("MJK" or the "Debtor"), respectfully submits his Investigatory Report, Final

Report and Account of Administration of the Estate (the "Final Report")[1].

## I.    NOTICE AND OBJECTION DEADLINE

        1.      You are hereby notified that the deadline to file an objection to this Final Report

is Tuesday, December 12, 2006, which date is 20 days after the date this Final Report was filed

and served by mail.  UNLESS A PARTY IN INTEREST FILES AN OBJECTION TO AND

REQUEST FOR A HEARING ON THE FINAL REPORT WITH THE CLERK OF THE

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MINNESOTA (THE

---

[1]     Prior to filing this Report, the Trustee filed with this Court quarterly interim reports for the periods ending as of December 31, 2001; March 29, 2002; June 27, 2002; September 30, 2002; December 31, 2002; March 31, 2003; June 30, 2003; September 30, 2003; December 29, 2003; March 31, 2004; June 30, 2004; September 30, 2004; December 31, 2004; March 31, 2005; June 30, 2005; September 30, 2005; December 31, 2005; March 31, 2006, June 30, 2006; and September 30, 2006 (these reports collectively, the "Prior Reports").  For a detailed description of all matters and activities in the Debtor's liquidation, see the Prior Reports.

"BANKRUPTCY COURT") BY NO LATER THAN DECEMBER 12, 2006, AND SERVES A COPY OF THE OBJECTION ON COUNSEL FOR THE TRUSTEE AND THE SECURITIES INVESTOR PROTECTION CORPORATION ("SIPC"), THE BANKRUPTCY COURT WILL ENTER SUCH ORDERS AS MAY BE NECESSARY OR APPROPRIATE, AND THE TRUSTEE WILL MAKE THE FINAL DISTRIBUTION PAYMENTS DESCRIBED IN THE FINAL REPORT. If an objection and request for hearing is timely served and filed, the Trustee will arrange for an expedited hearing on the objection with notice of hearing to the objecting party and SIPC, and the Bankruptcy Court will enter such orders as may be necessary and appropriate.

## II.     INTRODUCTION

2.     This Final Report is filed by the Trustee pursuant to section 78 fff-1(c) and 78fff-1(d) of SIPA[2] and Section 704(a)(9) of Title 11 of the United States Code (the "Bankruptcy Code"). 11 U.S.C. § 704(a)(9). The Final Report details the major aspects of this liquidation proceeding. Included within the Final Report is a description of matters to be completed in order to close the case.

### A.     History of MJK Clearing, Inc.

3.     Prior to its demise, the Debtor, a member of SIPC and a broker-dealer registered with the Securities and Exchange Commission, was engaged in the business of acting as a clearing firm for stock and other securities transactions. The Debtor was a clearing firm for its wholly owned subsidiary, Miller Johnson Steichen Kinnard, Inc. ("MJSK"), and sixty-four other independent, non-affiliated introducing firms (the "Outside Introducing Firms"). The Debtor cleared trades for approximately 175,000 individual account holders (the "Customers") as clearing agent for MJSK and the Outside Introducing Firms.

---

[2]     Hereinafter, all references to SIPA will omit "15 U.S.C. ____."

**B.** **Reasons for the Financial Demise of MJK**

4.      On September 25, 2001, the Debtor reported that Native Nations Securities, Inc. ("Native Nations"), a broker-dealer located in New Jersey, failed to make a $60 million payment owed to the Debtor on a stock loan transaction. As a result of this failure, the Debtor failed to meet its capital requirements and was required to inform federal regulatory agencies of the failure.

**C.** **Commencement of the SIPA Liquidation Proceeding**

5.      Upon receiving notice of the Debtor's capital shortfall, on September 27, 2001 (the "Filing Date"), pursuant to Section 78eee(a)(3) of SIPA, SIPC filed a Complaint and Application in the United States District Court for the District of Minnesota (the "District Court"). The Complaint alleged, among other things, that the Debtor failed to meet its obligations to Customers and that the Debtor's Customers were in need of the protections provided by SIPA.

6.      On the Filing Date, the Honorable Richard H. Kyle, Judge of the District Court, entered an Order Commencing SIPA Liquidation Proceeding (the "Protective Order"), which, among other things, determined that the Debtor's Customers were in need of the protections afforded by SIPA, commenced the liquidation proceeding, appointed the Trustee as the trustee for the liquidation of the Debtor, appointed Faegre & Benson LLP ("Faegre & Benson") as counsel for the Trustee, stayed certain actions in connection with the Debtor and its property, and removed the liquidation proceeding to the Bankruptcty Court.

**III.    SUMMARY OF INVESTIGATORY REPORT**

7.      SIPA requires the Trustee "to investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business, and any other matter, to the

extent relevant to the liquidation proceeding, and report thereon to the court." 15 U.S.C. § 78fff-1(d).

8.      Initially, the Trustee and his counsel conducted interviews with former employees of the Debtor, current and former employees of the Debtor's affiliates and other appropriate persons.

9.      In January 2002, the Trustee served Rule 2004 document subpoenas on 18 parties. The Trustee served or attempted service of Rule 2004 document subpoenas on 38 additional parties pursuant to the Bankruptcy Court's Order dated April 11, 2002, and on December 18, 2002, the Bankruptcy Court entered an Order allowing the Trustee and his counsel to conduct examinations of 11 people who have not been previously deposed.

10.      The results of the Trustee's investigation are reflected in the Trustee's complaints against Deutsche Bank AG and various other parties, and certain of MJK's officers and directors, which complaints and resulting proceedings are discussed in detail in Paragraphs 65 through 82, and 86 through 90, of this Final Report.

11.      The Trustee's investigation revealed that MJK's failure was caused by external fraud as detailed in the Trustee's complaints against against Deutsche Bank AG and various other parties. Copies of the complaints can be found by accessing the Trustee's website at www.mjktrustee.com. In addition, the Trustee's investigation led to the conclusion that inadequate internal controls allowed MJK to become a victim of the fraud. However, nothing in the Trustee's investigation indicated that any officer, director or employee of MJK was a direct participant in any fraudulent activities.

### III. FINAL REPORT ON ADMINISTRATION OF THE ESTATE

12.      Pursuant to section 78fff-2(c) of SIPA and section 541 of the Bankruptcy Code, the commencement of the MJK liquidation proceeding created an estate consisting of certain property including, without limitation, all legal and equitable interests of MJK (the "Estate"). Pursuant to section 78fff-1 of SIPA and section 323(a) of the Bankruptcy Code, the Trustee represents the Estate and is vested with all the powers of a trustee under the Bankruptcy Code, as well as additional powers enumerated in SIPA.  With this authority, upon his appointment, the Trustee undertook all necessary actions to investigate MJK's affairs, marshall MJK's assets and administer the Estate.  These actions are summarized below.

#### A.      Marshalling Assets and Securing of Debtor's Premises and Records

#### i.      Securing the Debtor's Property

13.      Immediately following his appointment, the Trustee secured the Debtor's premises and property.  Thereafter, with the assistance of counsel and his staff, the Trustee changed the Debtor's locks, safeguarded the Debtor's property and notified the financial institutions holding various of the Debtor's assets to freeze all such assets.

#### ii.      Transfer of Accounts, Sale of MJSK Stock

14.      Following the Debtor's collapse, approximately 175,000 active Customer accounts, whose trades had previously cleared through the Debtor, were frozen.  In an effort to remedy the immediate crisis and prevent further harm to the Customers, the Trustee quickly marketed the principal assets of the Debtor--the customer accounts and the stock of MJSK--by soliciting bids and proposals for the transfer of those assets.

15.      The Trustee reviewed six proposals to purchase these assets.  After permitting the bidders time to conduct due diligence, the Trustee entered into (1) an agreement (the "Account

Transfer Agreement") with SWS Securities, Inc. ("SWS") and SIPC for the transfer of substantially all of the Debtor's customer accounts to SWS and (2) a Stock Purchase Agreement (the "Stock Purchase Agreement") with Stockwalk Group, Inc. ("Stockwalk") pursuant to which Stockwalk purchased all of the capital stock of MJSK owned by the Debtor.

16.     The Trustee, SWS and SIPC entered into the Account Transfer Agreement on September 30, 2001. Pursuant to 15 U.S.C. § 78fff-2(f) and the terms of the Account Transfer Agreement, SWS agreed to accept the transfer of and assume liability for substantially all of the Debtor's Customer accounts. On October 2, 2001, the Court approved the Account Transfer Agreement and the Stock Transfer Agreement.

17.     On October 3, 2001, pursuant to the Account Transfer Agreement, the Trustee distributed to each of the Debtor's Customers, with certain exceptions, securities and cash having a value on the Filing Date equal to 90% of the net equity value of each Customer's account on the Filing Date plus the amounts of SIPC protection to which such Customer was entitled under SIPA (see paragraph 42, below). The result of this transfer and distribution was that all net equity claims of Customers for securities in the amount of $5,000,000 or less were satisfied in full, except for Customer claims of dealers, brokers, banks, and insiders of the Debtor. Distribution of the remained of the Customer's accounts occurred later and is described below in paragraphs 51 though 56.

18.     The Account Transfer Agreement had the effect of enabling most Customers to gain access to their entire accounts, thereby facilitating resumed trading. In addition, the Stock Purchase Agreement resulted in a payment of $3,200,000 to the Debtor's Estate.

19.     Subsequently, in the scope of the liquidation of the Debtor's Estate, the Trustee procured funds and marshaled assets, including making recoveries of assets and funds from a

variety of sources, including banks, broker-dealers and others.  Additionally, the Trustee analyzed potential actions against the Debtor and, in the process, identified the contingent losses and liabilities which could ultimately affect the amount of Customer property available for distribution to the Customers (the amount of customer property available for distribution is called the "Debtor's Customer Property Fund").  Subsequent distributions made to Customers from the Debtor's Customer Property Fund are described in more detail below.

### iii. Closing Out Positions

20.     As of the Filing Date, the Debtor had 2,377 unsettled trades totaling $91,264,785. The Trustee closed out the Debtor's open trade positions.

### iv. Closing Out Stock Loan Transactions

21.     As of the Filing Date, the Debtor was a party to approximately 400 stock loan transactions where it served either as a borrower of securities, a lender of securities or a conduit to parties making securities loans.  The Trustee closed out the Debtor's open stock loan transactions.

### v. Recovery of Funds from Debtor's Deposit Accounts

22.     The Trustee recovered funds totaling approximately $64,312,000  from more than 213 bank accounts previously held in the Debtor's name.

23.     All funds from the Debtor's pre-petition accounts with banking and other financial institutions were transferred and deposited into new accounts opened by the Trustee at Wells Fargo Bank, National Association ("Wells Fargo").

### vi. Liquidation of Clearing Accounts and Deposits

24.     The Trustee liquidated all known clearing accounts and deposits of the Debtor. All of the funds resulting from the liquidation of these accounts were deposited into the Trustee's accounts at Wells Fargo.

### vii. Other Activities

25.     SWS asserted claims against the Debtor's Estate related to certain accounts transferred to SWS and administrative costs pursuant to the Account Transfer Agreement. The Trustee successfully reconciled the outstanding differences with SWS and the parties entered into a settlement agreement. On December 16, 2003, the Bankruptcy Court entered an Order approving the settlement agreement between SWS and the Trustee.

26.     The Trustee reconciled the $2,000,000,000 portfolio of certificates of deposit issued by banks around the country and held in Customers' accounts. The Trustee successfully transferred the reconciled portfolio of certificates of deposit to SWS for the benefit of the Debtor's Customers.

27.     The Trustee investigated the need for services provided pursuant to the Debtor's executory contracts or unexpired leases, and to the extent he determined that such services were necessary for the liquidation of the Estate, the Trustee assumed those leases and contracts on terms favorable to the Estate. In certain circumstances, the Trustee negotiated short-term agreements for the continued provision of such services. To the extent the Trustee determined that any services provided pursuant to executory contracts or unexpired leases were required by entities other than the Debtor, the Trustee assigned those contracts and had the corresponding obligations assumed in order to reduce the Estate's potential liabilities.

28.     After the Filing Date, the Trustee and his staff continued to operate out of offices located at 5500 Wayzata Boulevard (the "Colonnade Premises"), the site of the Debtor's former offices.  Effective November 26, 2001, the Trustee rejected the Debtor's lease of the Colonnade Premises.  From the Filing Date through April 30, 2002, the Trustee occupied portions of two floors at the Colonade Premises pursuant to an agreement with Stockwalk.

29.     On May 1, 2002, the Trustee entered into a new lease (the "New Lease") with the landlord of the Colonnade Premises for considerably less space at the same premises.  On June 30, 2004, the Trustee terminated the New Lease, and arranged for the transfer of all records and files previously held at the Colonnade Building to off-site storage or to the offices of Faegre & Benson, as appropriate.

### viii.    Trustee's Accounting

30.     The Trustee, his counsel and the Trustee's Staff (as defined below) inventoried all securities, cash, and similar assets previously held by the Debtor.  The Trustee successfully reconciled the amounts of these assets with the amounts listed for them in the Depository Trust Company's records.  The assets collected by the Trustee, as well as those previously on deposit with the Depository Trust Company and other depositories were used to satisfy approved Customer claims and other creditor claims where possible.

### B.    Administrative Matters

### i.    Posting of Bond

31.     Pursuant to the Protective Order, the Trustee filed a fidelity bond with the Bankruptcy Court on November 9, 2001.  Thereafter, by an order entered on November 21, 2001, the Bankruptcy Court approved the Trustee's bond, which had been fixed at $100,000.

### ii. Retention of Professionals

32. The Trustee employed the following firms and individuals (collectively, the "Trustee's Stafff") to assist the Trustee in his duties concerning the orderly liquidation of the Debtor's Estate and the satisfaction of customer claims: Faegre & Benson, Financial Institutions Technology Services, Inc. ("FITS"), PricewaterhouseCoopers LLP ("PWC"), International Investigations, Foley & Lardner LLP ("Foley"), Borden Ladner Gervais LLP, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, and Ronald E. Pump of The Law Firm of Mohamed Al-Sharif. As described in the Prior Reports and herein, the Trustee's Staff assisted the Trustee in the performance of assorted functions germane to the liquidation proceeding, including, but not limited to, facilitating Customer account transfers, evaluating the Estate's assets, including claims on behalf of the Estate, investigating the Debtor's practices, processing, analyzing, and resolving Customer and general estate claims, representing the Trustee in litigation, and providing legal advice and accompanying services to the Trustee.

### iii. Meeting of Creditors

33. On December 17, 2001, the Trustee held the meeting of creditors for the purpose of examining the Debtor and its officers and directors and conducting such other related business.

### iv. Tax Matters

34. The Debtor's financial results are consolidated with those of its parent, Stockwalk, and certain affiliates, for tax reporting purposes. Accordingly, Stockwalk has filed, and will file, tax returns that include the Estate's financial results through the date this case is closed.

### v. Cooperation with Authorities

35.    The Trustee communicated with representatives from governmental and regulatory agencies to provide information gathered by the Trustee in the scope of his investigation of the Debtor's failure.  In addition, the Trustee responded to requests from securities regulators, federal and local law enforcement agencies, creditors, vendors and individual Customers and their counsel for information regarding the Debtor.  The Trustee attempted to accommodate these entities in a manner that neither interfered with the timely processing of Customer claims and objections nor placed an undue financial burden on the Estate.

### C.    Claims

### i.    Housekeeping Order

36.    Pursuant to a Motion dated October 24, 2001, the Bankruptcy Court entered an order granting the Trustee's Motion to Approve Publication of Notices, Procedures for Resolution of Clams and other Relief on November 5, 2001 (the "Housekeeping Order") which ordered, among other things, that: (i) notice of the commencement of the liquidation proceeding (the "Notice") be published in <u>The Wall Street Journal</u> (national and international editions), <u>The St. Paul Pioneer Press and Dispatch</u>, <u>The Minneapolis Star Tribune</u>, <u>The Duluth Tribune</u>, Bloomberg's website and the website established by the Trustee for the Debtor; (ii) the Notice, explanatory letters, claim forms and instructions be provided to each person who, according to the Debtor's books and records, appeared to have been a Customer of the Debtor with an open account within the preceding twelve (12) months, by mailing to each such person, at the address appearing in the Debtor's books and records, copies of such documents; and (iii) the Notice, explanatory letters, claim forms and instructions be provided to each creditor, other than

Customers, of the Debtor, by mailing to each such creditor, at the address appearing in the Debtor's books and records, copies of such documents.

37.     Pursuant to the Housekeeping Order, the Notice was published on November 15, 2001 in The Wall Street Journal (national edition), The St. Paul Pioneer Press and Dispatch, The Minneapolis Star Tribune and The Duluth Tribune, and on November 20, 2001 in The Wall Street Journal (international edition).  The Trustee was not able to publish the Notice on Bloomberg's website as the website does not publish such notices.

38.     Also pursuant to the Housekeeping Order, the required Notice, explanatory letters, claim forms and instructions were mailed, starting on November 16, 2001, and ending on November 27, 2001, to the Customers, the Outside Introducing Firms, other broker-dealers, creditors of the Debtor and some 35,000 former account holders.  Additionally, the Trustee's Staff mailed additional copies of the Notice, explanatory letters, claim forms and instructions as requested by Customers, broker-dealers or other potential creditors.

39.     The Housekeeping Order also fixed a bar date for the filing of claims.  Pursuant to Paragraph 7 of the Housekeeping Order and SIPA section 78fff-2(a)(3), no claim of any customer or creditor received by the Trustee after May 15, 2002 would be allowed as a customer claim.  Moreover, pursuant to Paragraph 4 of the Housekeeping Order and SIPA section 78fff-2(a)(3), any claim of a customer for net equity received by the Trustee after January 14, 2002 need not be paid or satisfied in whole or in part out of customer property, and, to the extent such claim was satisfied from monies advanced by SIPC, it was to be satisfied in cash or securities (or both) as the Trustee determined to be the most economical to the Estate.

### ii.    Customer Name Securities

40.    The Trustee's Staff distributed $914,767,895 of customer name securities to the Debtor's Customers.[3]

### iii.    Customer Claims

#### a.    SIPA Protection for Customer Claims

41.    In order to protect customers of an insolvent broker-dealer such as MJK, Congress established a statutory framework pursuant to which customers of a debtor in liquidation under SIPA are entitled to preferential treatment in the distribution of certain assets from the debtor's estate.  One mechanism through which such preferential status is implemented is the creation of a fund of "customer property," as defined in section 78*lll*(4) of SIPA.  Under the statutory framework, all customers share ratably in the customer fund, based on the "net equity" of their respective accounts.  SIPA § 78fff-2(c)(1)(B).  A customer's "net equity" claim, as defined in SIPA section 78*lll*(11), is the amount of a customer's claim after reduction for any indebtedness owed by the customer to the debtor.

42.    Based on the legislative priority scheme and as set forth more fully in the applicable sections of SIPA, customers' net equity claims may be satisfied, in whole or in part, by (a) first, return to the customer of all securities registered in the customer's name; (b) second, a distribution of cash and securities equal in value to the customer's *pro rata* share of the customer fund; and (c) third, to the extent not fully satisfied under (a) and (b) above, by an advance from SIPC.  SIPA generally requires SIPC to advance to a trustee such funds, not to exceed $500,000 for each customer (with a sublimit of $100,000 for claims for cash) as are necessary to satisfy a customer's net equity claim that exceeds that customer's ratable share of

---

[3]    Customer name securities do not constitute part of the fund of customer property under SIPA.

the customer fund.  A customer may assert a claim as a general unsecured creditor for any shortfall that exists after receipt of distributions under (a), (b), and (c) above.

43.     As described in more detail below, the Trustee satisfied the Customer claims in full in accordance with these procedures.

### b.     Bulk Transfer of Customer Accounts

44.     Before quantification of the customer fund, section 78fff-2(f) of SIPA provides that a trustee may transfer, in bulk, customer accounts of the debtor to another SIPC member, often for significant consideration.  A bulk transfer of accounts is intended to facilitate the prompt satisfaction of customer claims and the orderly liquidation of a debtor before the determination of the customer fund has been completed.  SIPA § 78fff-2(b).  Accordingly, before any determination is made as to the customer fund or its allocation, accounts of customers who qualify for SIPC protection may be transferred to a new clearing broker and then immediately released to the customers.  Accounts of customers who qualify for SIPC protection but whose accounts exceed the amounts of SIPC protection can also be transferred and released to the affected customers to the extent the accounts are within the limits of SIPC protection.

45.     As mentioned above, nearly all of the approximately 175,000 active Customer accounts, whose trades had previously cleared through the Debtor, were transferred to SWS pursuant to the Account Transfer Agreement, enabling most Customers to gain access to their entire accounts within days following the Filing Date, thereby facilitating resumed trading.

### c.     Customer Claims Filed; Customer Claim Determinations

46.     As of November 22, 2006, the Trustee had received 27,005 claims filed as Customer claims (the "Filed Customer Claims"), 33 of which were received after the May 15, 2002 claim filing deadline.  The Trustee's Staff reviewed, processed and resolved each of the

Filed Customer Claims.  The Trustee satisfied 25,814 of the Filed Customer Claims in full by the transfer of Customer accounts to SWS pursuant to the Account Transfer Agreement.  Of the remaining Filed Customer Claims, 1,124 were withdrawn or disallowed by orders of the Bankruptcy Court after the Trustee filed objections to such claims, 5 were allowed as Customer claims, 54 were resolved and treated as secured demand note claims (see paragraphs 47 through 49, below), and 8 were allowed and treated as general estate claims.

### iv.    Secured Demand Notes

47.    As part of its business, MJK had entered into Secured Demand Note Agreements (each, an "SDN Agreement") with 54 of its customers (each, an "SDN Lender").  Pursuant to the SDN Agreements, each SDN Lender delivered a Secured Demand Note (the "SDN") to evidence the SDN Lender's agreement to make a loan to MJK in the event that MJK became insolvent.  In addition, each SDN Lender pledged to MJK all of the cash and securities in its account held by MJK in order to secure that SDN Lender's obligations to make a loan to MJK under its SDN Agreement.  In many instances, the value of a particular account exceeded the face amount of the SDN that the account was pledged to secure (such excess, the "Excess Collateral").  Treatment of the SDN Lenders' claims was the subject of extensive negotiations between the Trustee and the SDN Lenders and their counsel.

48.    After several months of talks, the Trustee and the SDN Lenders entered into a settlement pursuant to which each SDN Lender agreed to accept (i) a disbursement equal to fifty (50%) of the value of the SDN Lender's Excess Collateral as of September 13, 2002 and (ii) an allowed unsecured claim in the amount of the total value of the SDN Lender's account as of September 13, 2002, less the amount distributed pursuant to clause (i), which claim was subordinated to all other allowed claims against the Estate other than allowed claims of other

SDN Lenders.   As of September 13, 2002, the principal balance of the SDN Notes was $16,300,000, the total value of the SDN Lenders' accounts was $27,563,273.20, and the total value of the Excess Collateral was $11,263,273.20.  By an order of the Bankruptcy Court dated February 12, 2003, the Trustee was authorized to implement the settlement with all 54 SDN Lenders.  As a result, 54 Customer claims against the Debtor's Estate totaling approximately $28,000,000 were eliminated.

49.     By the end of April 2003, the Trustee had distributed securities to SDN Lenders with a total value as of September 13, 2002 of $5,631,636.60.  The 54 SDN Lenders were given allowed, subordinated unsecured claims in the amount of $21,931,636.60.

### iv.     General Creditor Claims

50.     As of November 22, 2006, the Trustee had received 98 claims filed as general estate claims (the "Filed General Estate Claims").  The Trustee's Staff reviewed, processed and resolved each of the Filed General Estate Claims.  Thirty-nine of the Filed General Estate Claims were withdrawn or disallowed by orders of the Bankruptcy Court after the Trustee filed objections to such claims, and 59 were allowed and treated as general estate claims.  Together with the 8 claims filed as Customer claims but allowed as general estate claims, and the 54 SDN Lender claims treated as subordinated general estate claims, the Trustee allowed or allowed in part 121 general estate claims in the total amount of $33,840,237.67.

### D.     Allocation of Property of the Estate

### i.     First Interim Distribution to Customers

51.     One of the purposes of a SIPA liquidation proceeding is "to distribute customer property and … otherwise satisfy net equity claims of customers…."  15 U.S.C. § 78fff(a)(1)(B). As described in paragraph 17, above, on October 3, 2001, with certain exceptions, the Trustee

distributed 90% of the net equity value of each Customer's account on the Filing Date plus the amounts of SIPC protection to which such Customer was entitled under SIPA. Based on additional recoveries of Customer Property, on June 12, 2002, the Trustee filed and served a motion (the "First Interim Distribution Motion") to obtain authorization from the Court to effect an additional distribution (the "First Interim Distribution") of customer property to Customers which, together with the distributions on October 3, 2001, would result in each Customer receiving cash and securities having a value as of the Filing Date equal to 96% of that Customer's allowed claim for net equity as of the Filing Date, plus SIPC protection to the extent that such Customer was entitled to protection under SIPA. On June 28, 2002, the Bankruptcy Court entered an order approving: (i) the relief requested in the First Interim Distribution Motion and (ii) the method of distribution described therein.

52.     Following the First Interim Distribution, and after taking into account the SIPC protection provided to those Customers entitled to such protection, all allowed net equity claims of Customers for securities in the amount of $12,500,000 or less (other than Customer claims of insiders, brokers, dealers and banks) were satisfied in full.

### ii.     Interim Distribution to Insiders

53.     On October 8, 2002, the Trustee filed a motion to approve an interim distribution of customer property to 11 individuals and entities initially identified as "insiders" under SIPA. The Trustee also determined that a sufficient amount of customer property existed in the Debtor's Customer Property Fund to make an interim distribution to the insiders that would result in each of them receiving customer property having a value on the Filing Date equal to 96% of their claims for net equity as of the Filing Date.

### iii.     Second Interim Distribution to Customers

54.     On December 18, 2002, the Bankruptcy Court entered an order authorizing the Trustee to make a second interim distribution of customer property to Customers which, together with the previous distributions, resulted in each Customer with an allowed Customer claim total cash and securities having a value on the Filing Date equal to 98% of that Customer's allowed claim for net equity as of the Filing Date plus the amount of SIPC protection to which such Customer was entitled under SIPA.  Following the second interim distribution, and after taking account of the SIPC protection provided to those of the Debtor's Customers entitled to such protection, all net equity claims of Customers for securities in the amount of $25,000,000 or less (other than Customer claims of insiders, brokers, dealers and banks) were satisfied in full.  As a result of this second interim distribution, of the approximately 175,000 Customers who were eligible for SIPC coverage, only three Customers had allowed claims that had not then been satisfied in full.

### iv.     Final Distribution of Customer Property

55.     On May 10, 2004, the Trustee filed a Motion to Approve the Trustee's Customer Fund Determination and Allocation, Final Distribution to Customers, and Distributions to SIPC (the "Final Customer Pproperty Distribution Motion").  Pursuant to the Final Customer Prpperty Distribution Motion, the Trustee sought an order of the Bankruptcy Court authorizing or approving, as the case may be: (i) the Trustee's determination that certain assets constitute "customer property" as such term is defined in SIPA, (ii) a final distribution of customer property to Customers, (iii) the customer property distribution mechanism proposed by the Trustee, and (iv) repayment by the Trustee of certain advances made by SIPC to the Trustee.  On June 9, 2004, the Bankruptcy Court entered an order approving the Trustee's allocation of

customer property and authorizing the Trustee to make a final distribution of customer property to Customers (the "Final Customer Property Distribution").

56.     The Final Customer Property Distribution resulted in Customers with allowed claims in this case receiving customer property having a value on the Filing Date equal to 100% of each Customer's claim for net equity as of the Filing Date. As a result of the Final Distribution, all allowed net equity claims of Customers have been satisfied in full, including those of insiders, brokers, dealers and banks, except the net equity claims of 8 Customers the Trustee has been unable to locate.

### v.      Distributions to General Creditors

57.     On February 21, 2006, the Trustee filed a motion requesting authority to make an interim distribution of funds that constituted the general estate of the Debtor. The Court entered its order approving the motion on March 8, 2006. Pursuant to the order, the Trustee was authorized to repay all amounts advanced to the Trustee by SIPC and make distributionse on all allowed general estate claims that were filed as of February 21, 2006.

58.     The Trustee began distributions on allowed general creditor claims on March 17, 2006. As of November 22, 2006, the Trustee had distributed $33,784,595.96 in principal and $3,979,993.32 in interest in full satisfaction of 115 allowed general estate claims. As of November 22, 2006, the Trustee still had 5 unsecured claims totaling $51,848.71 that the Trustee had not yet satisfied. The Trustee expects that he will complete the distribution on the remaining claims by no later than December 22, 2006.

59.     In addition, the Trustee has identified 8 customers and 1 general estate creditor with allowed claims totaling $40,149.99 that the Trustee has been unable to locate to make distributions on their claims. Pursuant to 11 U.S.C. § 347, on November 22, 2006, the Trustee

filed an unclaimed property report and deposited with the Bankruptcy Court the funds necessary for making the distributions on those claims.

### vi. Amounts advanced by SIPC and repayment of advances

60. Through March 16, 2006, the Trustee requested, and obtained from SIPC, advances in the amount of $201,039,816.42, which were used to purchase securities for distribution to Customers and to pay administrative expense claims and other expenses incurred by the Trustee.

61. The Trustee has repaid to SIPC the entire amount advanced by SIPC to the Trustee, together with interest thereon in the amount of $ 11,294,487.78.

### E. Brief summary of significant litigation

62. Upon entry of the Protective Order, all litigation against the Debtor was automatically stayed pursuant to Section 362 of the Bankruptcy Code.

63. As stated above, the Trustee has all of the powers of a trustee under the Bankruptcy Code. In addition, upon his appointment, pursuant to sections 78fff-1(a) and 78fff-2(c)(3) of SIPA, the Trustee was empowered and statutorily required to recover property that should have been held in trust for Customers of MJK. In fulfillment of his duties, the Trustee (a) analyzed whether any pre-petition transfers by the Debtor were avoidable under either section 547 or 548 of the Bankruptcy Code; (b) reviewed the pre-petition conduct of the Debtor's principals, employees, accountants and financial and banking institutions; (c) identified potential sources for recovery of monies for the Estate; and (d) analyzed causes of action against third parties.

###### i. Actions Initiated by the Trustee

64. Based on this review, the Trustee determined he had viable causes of action against the individuals and entities described in more detail below.

###### a. Deutsche Bank AG, et al.

65. On September 19, 2002, the Trustee filed a complaint commencing an adversary proceeding (Adv. No. 02-4178) (Bankr. D. Minn. 2002) against Deutsche Bank AG and various other parties (the "Deutsche Complaint"). On December 18, 2002, the Bankruptcy Court entered an Order transferring the case to the District Court (Court File No. 02-CV-4845). The case was assigned to Judge Kyle.

66. In the Deutsche Complaint, the Trustee sought damages in the amount of $335,000,000 under various federal and state law claims that are further detailed in the Deutsche Complaint, and asked that such damages be trebled as allowed pursuant to various federal statutes. A copy of the Deutsche Complaint can be found by accessing: (i) the Court's website at www.mnb.uscourts.gov and searching in case number 02-4178 or (ii) the Trustee's website, www.mjktrustee.com.

67. Responsive pleadings were received from the following defendants: Deutsche Bank AG, Deutsche Bank Securities, Inc., Deutsche Bank Securities Limited (collectively, the "Deutsche Bank Defendants"), Wayne Breedon, RBF International, Inc., Kenneth D'Angelo and Richard Evangelista.

68. The Deutsche Bank Defendants and Wayne Breedon served the Trustee with motions to dismiss the Deutsche Complaint. On September 8, 2003, Judge Kyle issued a Memorandum, Opinion and Order ruling on the motions to dismiss, which were granted in part and denied in part. Four of the Trustee's fifteen claims were dismissed with prejudice as to the

Deutsche Bank Defendants and five of the Trustee's fifteen claims were dismissed as to Wayne Breedon. Judge Kyle denied the remainder of the motions, permitting the Trustee's remaining claims, including claims of securities fraud, to go forward.

69. The Trustee originally granted defendants GenesisIntermedia, Inc. and Bradford Keiller extensions of time to answer or otherwise plead. Following meetings with each of these defendants, the Trustee agreed to further extend the time for these defendants to answer or otherwise plead until 30 days after the receipt of Judge Kyle's Memorandum, Opinion and Order on the motions to dismiss. Mr. Keiller received additional extensions of time in which to file an answer or otherwise respond.

70. The Trustee received no answer or responsive pleading to the Deutsche Complaint from defendants Ramy El-Batrawi, Ultimate Holdings, Ltd., and Adnan Khashoggi. Accordingly, the Trustee moved for entry of default against these three defendants. On September 4, 2003, the Clerk of Court entered defaults as to defendants Ramy El-Batrawi, Ultimate Holdings, Ltd., and Adnan Khashoggi.

71. On June 1, 2004, Magistrate Judge Boylan issued an order permitting the Trustee to further amend his Amended Complaint to add claims against certain defendants for violations of the New Jersey Racketeer Influenced and Corrupt Organizations Act (the "New Jersey RICO Claims"). The Trustee subsequently filed and served his Second Amended Corrected Complaint.

72. On October 6, 2004, Judge Kyle heard the motions of certain defendants to dismiss the Trustee's New Jersey RICO claims. On November 4, 2004, Judge Kyle issued a decision denying the defendants' motion and permitting the Trustee to proceed with his New Jersey RICO claims.

73.     The Trustee and Faegre & Benson committed significant amounts of time, effort, and resources to the discovery phase of this litigation.  During the course of the litigation, counsel for the Trustee prepared for, attended, and participated in 60 depositions in at least six different North American cities.  In addition, the Trustee and Faegre & Benson spent time consulting and working with experts, specialists, and other potential contributors to the Trustee's action against these defendants.  The Trustee and Faegre & Benson also worked closely with certain other plaintiffs and their counsel, who were engaged in similar litigation against the Deutsche Bank Defendants and related parties.

74.     Certain expert reports were served by Faegre & Benson on February 18, 2005.  Reports of responsive experts were served by certain defendants on Faegre & Benson on March 21, 2005.

75.     During the first quarter of 2005, counsel for the Trustee prepared, argued, and prevailed on a motion to compel the deposition of defendant Kenneth D'Angelo.  In addition, counsel for the Trustee filed a motion to amend the Deutsche Complaint to add a claim for punitive damages.  That motion was heard by Magistrate Judge Boylan on April 5, 2005.

76.     During this period of time, counsel for the Trustee also filed and served an amended copy of the Deutsche Complaint on the defendants, which included a claim for punitive damages.  In addition, various parties to this litigation prepared and filed motions for judgment and partial summary judgment.

77.     The parties participated in a settlement conference with Magistrate Judge Boylan on November 16-18, 2005.  During the course of the settlement conference, the Trustee settled all claims with the Deutsche Bank Defendants and Defendant Wayne Breedon.  On November 22, 2005, Judge Kyle issued an order dismissing the case with prejudice.  The District Court

expressly retained jurisdiction for 90 days to permit any party to move to reopen the action, file a stipulated form of final judgment, or seek enforcement of the settlement agreement.

78.     The settlement agreement was approved by the Bankruptcy Court on January 18, 2006.  As a result of the Trustee's settlement with the Deutsche Bank Defendants and Wayne Breedon, the Deutsche Bank Defendants paid the Trustee the sum of $147,500,000 and caused certain creditors to withdraw filed claims against the Debtor totaling approximately $120,000,000.

79.     On February 14, 2006, the Trustee filed a motion to reopen the case with Judge Kyle.  On February 21, 2006, Judge Kyle granted the Trustee's motion to reopen the case.

80.     On June 26 and 27, 2006, the Trustee participated in a settlement conference with Defendants GenesisIntermedia, Inc., Richard Evangelista, and Bradford Keiller before Magistrate Judge Boylan.  The settlement conference continued on August 22, 2006.  Efforts to settle the matter with GenesisIntermedia, Inc. and insurers are ongoing as of the date of this filing.

81.     On July 10, 2006, the Trustee filed a motion for default judgment against Defendants Kenneth D'Angelo, RBF International, Inc., GenesisIntermedia, Inc., Ramy El-Batrawi, Ultimate Holdings, Ltd., and Adnan Khashoggi.  Defendant Ramy El-Batrawi filed a motion to set aside the entry of default, and opposed the motion for default judgment.  Judge Kyle held a hearing on August 22, 2006, and took the motions under advisement.

82.     On September 12, 2006, Judge Kyle recused himself from the case, citing a newly arisen conflict of interest, without ruling on the pending motions.  The case has been reassigned to Judge Michael A. Davis.  Magistrate Judge Boylan remains the magistrate assigned to the case.

83.     Pursuant to 11 U.S.C. § 726(b)(6), the Trustee intends to distribute to the Debtor all of the Estate's remaining interests in this lawsuit on or shortly after the 20th day after this Final Report is filed and served.

### b.     Native Nations Securities, Inc.

84.     The Trustee commenced an adversary proceeding against Native Nations (Minnesota Adv. No. 01-4274). The parties entered into extensive settlement negotiations and entered into a Stipulation and Consent to Judgment, by which Native Nations authorized the Bankruptcy Court to enter a judgment against it and in favor of the Trustee in the amount of $209,774,551.59. The Bankrupcty Court entered an Order for Judgment on June 12, 2002. This adversary proceeding is closed. On August 19, 2002, an involuntary Chapter 7 bankruptcy petition was filed against Native Nations.

85.     The Trustee filed claims in the Native Nations' bankruptcy case totaling approximately $226,000,000 (the "Native Nations Claims"). The final report and account of the administration of the Native Nations estate and final application for compensation ("Native Nations Final Report"), dated July 3, 2006, indicates that the Trustee will receive a distribution in the amount of $3,176,781.51 on account of the Native Nations Claims. The Native Nations Final Report was approved on November 16, 2006. The Trustee anticipates he will receive the referenced distribution on or about November 30, 2006.

### c.     Officers and Directors of the Debtor

86.     On July 3, 2002, the Trustee filed a complaint (the "D&O Complaint") commencing an adversary proceeding (Minnesota Adv. No. 02-4131) against the following former officers of the Debtor: Todd Miller, Jeff Houdek, Paul Meehl, Michael Schierman and Thomas Brooks (collectively, the "D&O Defendants"). The D&O Complaint asserted claims of

negligence, breach of fiduciary duty and mismanagement against each of the D&O Defendants in connection with the Debtor's securities loan business.

87. Defendants Miller, Houdek, Meehl and Schierman each filed a separate answer to the D&O Complaint and a crossclaim against Defendant Brooks. Defendant Brooks also filed an answer to the D&O Complaint.

88. On September 19, 2002, at the scheduling conference for this adversary proceeding, the Bankruptcy Court entered an order requiring the Trustee and the D&O Defendants to submit to a mediation of their disputes before Magistrate Judge Arthur J. Boylan. The Trustee and the D&O Defendants participated in joint mediation sessions before Judge Boylan, along with the litigants in the cases of Cooper v. Miller Johnson Steichen Kinnard Inc., Court File No. 02-CV-1236 RHK/AJB, pending before Judge Kyle and Ferris v. Miller, et al., Court File No. 02-CV-1322 RHK/AJB, also pending before Judge Kyle.

89. At the mediation, the parties reached an agreement, subject to various contingencies, to settle all three of the cases. On April 30, 2003, the Bankruptcy Court entered: (i) an Order approving the settlement and (ii) an Order dismissing the Trustee's Action against the D&O Defendants. On July 3, 2003, in the matter styled In re Stockwalk Group, Inc. (Bankr. Case No. 02-40585) (Bankr. D. Minn. 2003), the Bankruptcy Court entered an Order approving certain aspects of the settlement agreement.

90. As a result of the settlement, the Trustee collected $9,073,200 for the Debtor's Estate and resolved substantially all of the insider Customer claims against the Debtor's Estate.

### d. Greenblatt, et al.

91. On February 24, 2003, the Trustee filed a complaint (the "Greenblatt Complaint") commencing an adversary proceeding (ADV. No. 03-4053) (Bankr. D. Minn. 2003) against Leon

A. Greenblatt, Banco Panamericano, Inc., Loop Corp., Nola L.L.C., and Repurchase Corp. (collectively, the "Greenblatt Defendants") seeking to collect more than $6,800,000 pursuant to margin loan agreements, promissory notes and a guaranty.

92.     On October 9, 2003, the Bankruptcy Court entered judgment awarding the Trustee more than $4,500,000 from various of the Greenblatt Defendants, as well as $3,000,000 worth of tax credits and $114,986.93 in attorneys' fees and expenses. The Greenblatt defendants filed an appeal, but failed to post a bond pending appeal. On appeal, the District Court upheld the Bankruptcy Court's decision, but reduced the amount of the monetary judgment by $3,000,000.

93.     The Trustee appealed the District Court's decision to reduce the monetary judgment by $3,000,000. The Greenblatt Defendants filed a cross-appeal challenging the District Court's determination that the promissory notes and guaranty were supported by consideration. The Trustee filed a motion to dismiss the appeal in order to focus efforts on collecting his judgment against the Greenblatt Defendants. On March 16, 2005, the parties argued their cases to a three-judge panel of the United States Court of Appeals for the Eighth Circuit. Subsequently, the Eighth Circuit entered an order denying the Greenblatt Defendants' cross-appeal.

94.     The Trustee is proceeding with collection efforts in Illinois with the assistance of Foley. In addition to serving discovery requests on the Greenblatt Defendants, the Trustee deposed Mr. Greenblatt. The Trustee also served asset citations on certain entities and individuals believed to have information concerning Greenblatt Defendants' assets.

95.     Despite extensive collection efforts, the judgment amounts remain unpaid. Pursuant to 11 U.S.C. § 726(b)(6), the Trustee intends to distribute to the Debtor all of the

Estate's remaining interests in this judgment on or shortly after the 20th day after this Final Report is filed and served. On information and belief, as a result of a separate settlement agreement, the Debtor will then transfer all remaining interest in this judgment to Deutsche Bank.

### e.  Margin Loans

96.  The Trustee demanded in writing payment on the amounts due on various margin loans made by the Debtor to certain of its customers. The Trustee entered into 30 settlement agreements with individuals with margin loan accounts and obtained Court approval of these settlements. As a result of these settlements, the Trustee has collected approximately $8,500,000 for the Estate. In addition, three margin loan customers are obligated to pay $575,800 to the Estate pursuant to settlement agreements with the Trustee.

97.  In addition, as part of his collection actions, the Trustee commenced 29 separate adversary proceedings against individuals with margin loan accounts, seeking the turnover and a judgment for all monies owed to the Debtor on account of such margin loans. These adversary proceedings resulted in judgments for the Estate in the amount of $962,831.00.

98.  Pursuant to 11 U.S.C. § 726(b)(6), the Trustee intends to distribute to the Debtor all of the Estate's remaining interests in margin loan accounts, settlements and judgments on or shortly after the 20th day after this Final Report is filed and served.

### f.  Other Litigation

99.  As described in the Prior Reports, the Trustee also commenced additional litigation and entered into settlement agreements resolving these adversary proceedings. Pursuant to 11 U.S.C. § 726(b)(6), the Trustee intends to distribute to the Debtor all of the Estate's

remaining interests in such litigation and settlement agreements, if any, on or shortly after the 20th day after this Final Report is filed and served.

### ii. Actions Defended by the Trustee

100. The Trustee also defended against the various actions that were brought against the Estate.

### a. Maple Securities, U.S.A. (Minnesota Adv. No. 01-4283)

101. The Trustee and Advanced Clearing, Inc. were named as defendants in a lawsuit commenced by Maple Securities U.S.A., Inc. ("Maple"), in which Maple attempted to recover cash collateral it posted with the Debtor, and the Debtor posted with Advanced Clearing, in connection with certain securities loan transactions. The Trustee filed a counterclaim against Maple and a crossclaim against Advanced Clearing, Inc. The Court entered an Order on September 9, 2002, granting summary judgment in favor of the Trustee on all claims, and entered a Judgment in favor of the Trustee on September 9, 2002. On September 18, 2002, Maple filed and served a Notice of Appeal and an Election that its appeal be heard by the United States District Court. Maple, Advanced Clearing and the Trustee entered into a settlement agreement by which Maple and the Trustee agreed to dismiss their respective claims against Advanced Clearing in exchange for a payment to the Trustee by Advanced Clearing in the amount of $7,014,179.33. The Court entered an Order approving the settlement on July 23, 2002.

102. Following the discovery stage of the Maple adversary proceeding, the Trustee filed a motion seeking summary judgment in his favor on each of Maple's claims and the Trustee's counterclaim. After a response brief from Maple, a reply brief from the Trustee and oral arguments before the Court, the Bankruptcy Court entered an Order on September 9, 2002,

granting summary judgment in favor of the Trustee on all claims. Accordingly, the Court entered a Judgment in favor of the Trustee on September 9, 2002.

103.    On September 18, 2002, Maple filed and served a Notice of Appeal and an Election that its appeal be heard by the District Court. Subsequently, Maple and the Trustee filed a joint Stipulation of Dismissal of Appeal with the District Court, requesting the dismissal of the case. On November 8, 2002, the Honorable Joan E. Lancaster, Judge of the District Court, entered an Order dismissing Maple's Appeal.

### b.    Ferris Baker Watts, Inc.

104.    Ferris, Baker, Watts, Inc. ("Ferris") initiated an adversary proceeding against the Trustee (Minnesota Adv. No. 01-4275) in which Ferris attempted to recover cash collateral it posted with the Debtor in connection with certain securities loan transactions. In response, the Trustee filed a counterclaim against Ferris.

105.    Following the discovery stage in the Ferris adversary proceeding, the Trustee and Ferris filed cross-motions for summary judgment. On November 22, 2002, the Bankruptcy Court entered an Order granting summary judgment in favor of the Trustee on all claims. Accordingly, the Court entered a Judgment in favor of the Trustee on November 22, 2002. On November 27, 2002, Ferris filed and served a Notice of Appeal and an Election that its appeal be heard by the District Court.

106.    On April 7, 2003, the District Court entered an Order affirming the Bankruptcy Court's granting summary judgment in favor of the Trustee on all claims and a Judgment in favor of the Trustee. Subsequently, Ferris filed and served a Notice of Appeal to the United States Court of Appeals for the Eighth Circuit (Case No. 03-2443).

107.     On February 12, 2004, following a full briefing of all issues on appeal, the parties argued their cases to a three-judge panel of the United States Court of Appeals for the Eighth Circuit.  On June 9, 2004, the United States Court of Appeals for the Eighth Circuit issued an opinion affirming the lower courts' granting of summary judgment to the Trustee.

### c.     Other Settlements

108.     Prior to the initiation of adversary proceedings, and to avoid costly and time-consuming litigation, the Trustee settled two disputes with ADP Financial Information Services, Inc. ("ADP") and Plaid Brothers Software, Inc. ("Plaid").  Pursuant to the terms of the settlement with ADP, the Trustee made a $250,000 payment to ADP in exchange for complete satisfaction and compromise of all amounts owed by the Trustee to ADP for the Trustee's use of ADP's products and services after the Filing Date.  The Court entered its Order approving the ADP Settlement Stipulation on April 3, 2002.

109.     The Trustee entered into a settlement agreement with Plaid, MJSK, Stockwalk, SWS and Southwest Clearing Corp.  Under the settlement agreement, the Trustee agreed to pay $25,000 to Plaid.  The Court authorized the Trustee to enter into the settlement agreement by its Order dated June 18, 2002.

### d.     Mary Joanne Feltl

110.     On August 27, 2002, Mary Joanne Feltl filed a complaint commencing an adversary proceeding (Bankr. D. Minn. No. 02-4178) against the Trustee.  In her complaint, Mrs. Feltl sought an order requiring the Trustee to turn over her interest in two accounts jointly held by her and her husband, an insider of the Debtor.  On November 14, 2002, Mrs. Feltl's complaint against the Trustee was dismissed.

### F. Disposition of books and records

#### i. Debtor's Books and Records

111. The remaining books and records of the Debtor are currently stored at the offices of Faegre & Benson and Iron Mountain Storage. The Trustee will deliver the books and records to MJK before the end of December 2006.

#### ii. Estate's Books and Records.

112. The Trustee intends to keep his records of administration of the Estate for five (5) years from the date of closing of the case.

### G. Transfer of Assets to MJK

113. As of November 22, 2006, the Trustee had $18,974,000.00 invested in U.S. Treasuries and FDIC-insured deposits through Wells Fargo Bank, National Association's Corporate Trust department, and $315,881.14 on deposit in a demand deposit account at Wells Fargo. These amounts, less the fees and costs incurred during the transfer of the Estate as described below, will be transferred to MJK.

## IV. FEES AND EXPENSES REQUESTED BY THE TRUSTEE AND COUNSEL; ADMINISTRATIVE EXPENSES

114. The Trustee and his counsel are filing separately, but contemporaneously with this Final Report, their final applications for allowance of fees and expenses, seeking 100% of the fees incurred by each in administration of this case.

115. The Trustee has, to date, received approval for compensation in the amount of $697,522.50 pursuant to his First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Applications, each of which were approved by the Bankruptcy Court. The compensation paid to the Trustee to date represents 100% of his allowed fees through October 31, 2005 and 90% of his allowed fees from

November 1, 2005 through June 30, 2006. 10% of the Trustee's allowed fees for the period

November 1, 2005 through June 30, 2006, totaling $6,819.10, have been withheld pending

approval of the Trustee's final fee application. By his final applications for allowance of fees,

the Trustee seeks approval of: (a) allowance and payment of final compensation in the amount

of $8,432.50 for fees for the period of July 1, 2006 through October 16, 2006; (b) allowance and

payment of a performance bonus in the amount of $500,000 for his services as Trustee from the

Filing date through the date the case is closed, and (c) payment of the 10% of the fees previously

withheld in the total amount of $6,819.10. If the Court awards the $500,000 performance bonus

to the Trustee, the Trustee will not charge the Estate for any services provided by the Trustee

from October 17, 2006 through the date the case is closed.

116.    Faegre & Benson has, to date, received approval for compensation in the amount

of $10,746,368.50 and reimbursement of out of pocket expenses in the amount of $911,839.76

pursuant to its First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh,

Twelfth, Thirteenth, Fourteenth, and Fifteenth Applications, each of which were approved by the

Bankruptcy Court. The sums paid to Faegre & Benson to date represent 100% of the allowed

costs and 100% of the allowed fees through October 31, 2005, less a $100,000 holdback amount,

together with 100% of the allowed costs and 90% of Faegre & Benson's allowed fees from

November 1, 2005 through June 30, 2006. $100,000 plus 10% of Faegre & Benson's allowed

fees for the period November 1, 2005 through June 30, 2006, totaling $154,071.63, have been

withheld pending Faegre & Benson's final fee application. By its final applications for

allowance of fees, Faegre & Benson seeks approval of: (a) allowance and payment of final

compensation for fees in the amount of $140,598.00 and $13,735.82 in out of pocket expenses

for the period of July 1, 2006 through October 16, 2006; (b) payment of the 10% of the fees plus

the $100,000 holdback amount previously withheld in the total amount of $153,350.25; and (c) allowance and payment of up to an additional $150,000 for Faegre & Benson's estimated time and out of pocket expenses from October 17, 2006 through the date the case is closed, subject only to the review and approval of SIPC.

117.     Foley has, to date, received approval for compensation in the amount of $409,569.50 and reimbursement of out of pocket expenses in the amount of $25,830.04 pursuant to its First, Second and Third Applications, each of which were approved by the Bankruptcy Court. The sums paid to Foley & Lardner to date represent 100% of the allowed costs and 100% of the allowed fees through June 30, 2006. By its final applications for allowance of fees, Foley & Lardner seeks approval of: (a) allowance and payment of final compensation for fees in the amount of $85,969.00 and $8,261.36 in out of pocket expenses for the period of July 1, 2006 through October 19, 2006; and (b) allowance and payment of up to an additional $100,000 for Foley & Lardner's estimated time and out of pocket expenses from October 19, 2006 through the date the case is closed, subject only to the review and approval of SIPC.

118.     The Trustee will also pay all administrative expenses, other than lawyers' fees, if any, arising from the completion of the liquidation. This could include fees payable to PWC or FITS. See SIPA §§ 78fff-1(a)(1). The Trustee anticipates that these administrative expenses will total less than $150,000.

## V.     FINAL ACCOUNTING

119.     The Trustee has reported to SIPC all cash sources and uses since the Filing Date, using SIPC's form 17. Attached hereto is the Trustee's Form SIPC-17 for the period ending October 31, 2006. Upon completion of all distributions, the Trustee will file with SIPC a final

Form SIPC-17, and work with SIPC to prepare a final cash report for the liquidation of the

Estate, known as a Form SIPC-18.

120. Set forth below is a report of the Trustee's cash as of November 20, 2006,

together with an estimate of additional cash revenues the Trustee anticipates collecting before the

case is closed, and the Trustee's anticipated uses and distributions of the cash:

| Anticipated/Available Cash | |
|---|---|
| Cash on hand | $315,881.14 |
| T-Bill Investments | $18,974,000.00 |
| Anticipated distribution from Native Nations Trustee | $3,176,781.51 |
| **Subtotal** | **$22,466,662.65** |
| **Anticipated Disbursements** | |
| Fee Applications for Trustee, Faegre & Benson LLP and Foley & Lardner LLP | ($917,166.03) |
| Estimated additional attorney fees after October 17, 2006 | ($150,000) |
| Estimated additional administrative expenses until the case is closed | ($150,000) |
| Anticipated Distributions to Claimants | ($51,848.71 plus interest from September 27, 2001 at 2.6% per annum) |
| Amount deposited with Bankruptcy Court on November 21, 2006 for $40,149.99 in Unclaimed Distributions and $468.71 in interest on from September 27, 2001 for one general estate claim | ($40,618.70) |
| **Subtotal** | **($1,309,633.44)** |
| **TOTAL** | **$21,157,029.21** |

Dated:  November 22, 2006

         /e/ Theresa H. Dykoschak
Stephen M. Mertz (#212131)
Theresa H. Dykoschak (#0349999)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, MN 55402-3901
Phone # (612) 766-7000
Fax # (612) 766-1600

Attorneys for James P. Stephenson,
as trustee for the liquidation of
MJK Clearing, Inc.

fb.us.61208869.13

## VERIFICATION

I, James P. Stephenson, am the liquidating trustee of MJK Clearing, Inc. (the "Trustee"). I declare under penalty of perjury that the facts stated in the foregoing Trustee's Investigatory Report, Final Report and Account of Administration of the Estate are true and correct according to the best of my knowledge, information and belief.

Dated: Nov 22 , 2006

_____
James P. Stephenson

fb.us.61094331.01

# SECURITIES INVESTOR PROTECTION CORPORATION

James P. Stephenson, Trustee of MJK Clearing, Inc.
(Name of Trustee)
(Debtor Firm)

Report No. 0061

**Period Ended: October 31, 2006**
**CASH RECEIPTS:**

| General Cash Receipts | Net Change for Period | Prior Period Cumulative | Total Received Cumulative | Customer Fund | Cumulative Detail General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $19,061,135.62 | | | | | | |
| Transfer from Debtor's Estate | | 71,265,936.77 | 71,265,936.77 | $71,265,936.77 $ | 55,273.44 | | 4010 |
| Customers | 25,500.00 | 39,074,814.30 | 39,100,314.30 | 39,100,314.30 | | | 4020 |
| Customers - Sale of Debit Balances | | 411,830,229.41 | 411,830,229.41 | 411,830,229.41 | | | 4021 |
| Customers - Sale of Correspondent Inventory | | 36,973,503.76 | 36,973,503.76 | 36,973,503.76 | | | 4022 |
| Customer - FDIC Pass - Thru | | 53,338,675.53 | 53,338,675.53 | 53,338,675.53 | | | 4023 |
| Broker/Dealer's - Customer close outs | | 52,483,113.83 | 52,483,113.83 | 52,483,113.83 | | | 4030 |
| - Other close outs | | 0.00 | 0.00 | | | | 4031 |
| Interest and Dividends | | 14,440,368.39 | 14,440,368.39 | 14,385,094.95 | 55,273.44 | | 4040 |
| Mutual Fund Trail Commissions | | 814,805.13 | 814,805.13 | | 814,805.13 | | 4050 |
| Sale of Securities | | 7,766,908.09 | 7,766,908.09 | 2,617,944.52 | 5,148,963.57 | | 4060 |
| Sale of Securities - SDN's | | 17,963,512.67 | 17,963,512.67 | 17,963,512.67 | | | 4061 |
| Sale of Debtor's Assets | | 44,645.47 | 44,645.47 | | 44,645.47 | | 4070 |
| Refunds - General | | 62,468.51 | 62,468.51 | | 62,468.51 | | 4090 |
| - Deposits | | 23,742,808.76 | 23,742,808.76 | | 23,742,808.76 | | 4091 |
| - Subscriptions | | 46.00 | 46.00 | | 46.00 | | 4092 |
| - Other | | 0.00 | 0.00 | | | | 4099 |
| Recoveries - General | | 25.00 | 25.00 | | 25.00 | | 4100 |
| - Insurance | | 1,508.17 | 1,508.17 | | 1,508.17 | | 4101 |
| - Insiders | | 187,709.72 | 187,709.72 | 187,709.72 | | | 4102 |
| - Taxing Authorities | | 2,187.48 | 2,187.48 | | 2,187.48 | | 4103 |
| - Lawsuits | | 18,162,833.16 | 18,162,833.16 | 7,204,876.14 | 10,957,957.02 | | 4104 |
| - SDN's | | 5,973,280.36 | 5,973,280.36 | | 5,973,280.36 | | 4105 |
| - Advantage Bank CD | | 0.00 | 0.00 | | | | 4106 |
| - Deutsche Bank | | 147,500,000.00 | 147,500,000.00 | 47,288,948.52 | 100,211,051.48 | | 4107 |
| - Insider Security Deposits | | 0.00 | 0.00 | | | | 4109 |
| Miscellaneous - Bankers Trust | | 0.00 | 0.00 | | | | 4110 |
| Interest on Trustee's Investments | 62,532.48 | 1,763,477.58 | 1,826,010.06 | 409,238.24 | 1,416,771.82 | | 4120 |
| Interest on Trustee's Savings Accounts | | 0.00 | 0.00 | | | | 4140 |
| Journal Entry per Allocation | | 0.00 | 0.00 | 60,345,912.01 | -60,345,912.01 | | 4200 |
| **Sub-total General Cash Receipts** | **$88,032.48** | **$903,392,858.09** | **$903,480,890.57** | **$797,431,497.70** | **$106,049,392.87** | | |
| Advances from SIPC | | | | | | | |
| Administration - Advanced | | 32,779,242.39 | 32,779,242.39 | | | 32,779,242.39 | 2901 |
| Open Contractual Commitments | | 0.00 | 0.00 | | | 0.00 | 2911 |
| Securities - Paid Bank Loans | | 3,699,831.47 | 3,699,831.47 | | | 3,699,831.47 | 2921 |
| - Cash in Lieu | | 0.00 | 0.00 | | | 0.00 | 2922 |
| - Purchases | | 153,117,097.04 | 153,117,097.04 | | | 153,117,097.04 | 2923 |
| Indemnification | | 0.00 | 0.00 | | | 0.00 | 2931 |
| Cash Balances | | 11,443,645.52 | 11,443,645.52 | | | 11,443,645.52 | 2941 |
| Other | | 0.00 | 0.00 | | | 0.00 | 2951 |
| **Sub-total SIPC Advances** | **$0.00** | **$201,039,816.42** | **$201,039,816.42** | | | **$201,039,816.42** | |
| Investments by Trustee - Sales | | $1,104,432,674.51 | $1,104,520,706.99 | $797,431,497.70 | $106,049,392.87 | $201,039,816.42 | 1900 |
| **Total Cash Receipts** | **$88,032.48** | **$1,104,432,674.51** | **$1,104,520,706.99** | **$797,431,497.70** | **$106,049,392.87** | **$201,039,816.42** | |

EXHIBIT A

CASH DISBURSEMENTS:

_Administrative Disbursements_

| General Administrative Disbursements | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| Computer - Processing | | $1,560,615.62 | $1,560,615.62 | 5010 |
| - Rental | | 4,084.40 | 4,084.40 | 5011 |
| Employee related - Salaries-Net | | | 0.00 | 5020 |
| - FICA-Employer | | | 0.00 | 5021 |
| - P/R Taxes Withheld | | | 0.00 | 5022 |
| - Fed. & St. Unemploy. | | | 0.00 | 5023 |
| - Temporary Help | | 12,500.00 | 12,500.00 | 5024 |
| - Other | | 9,441.48 | 9,441.48 | 5029 |
| Insurance - Trustee Bond | | | 0.00 | 5030 |
| - Surety & Fidelity Bonds | | 7,010.34 | 7,010.34 | 5031 |
| - Other | | 444.16 | 444.16 | 5039 |
| Fees - Transfer & Certificate | | 2,221.23 | 2,221.23 | 5040 |
| - Cert. of Court Orders | | | 0.00 | 5041 |
| - Appraisal | | 6,953.33 | 6,953.33 | 5042 |
| - Court Reporter & Transcripts | | 126,590.55 | 126,590.55 | 5043 |
| - Financial Institutions | | | 0.00 | 5044 |
| - Bank Service Charge | 25.97 | 7,183.55 | 7,209.52 | 5045 |
| - Discovery Documentation | | 59,653.54 | 59,653.54 | 5046 |
| - Investigative Services | | 3,492.17 | 3,492.17 | 5047 |
| - Other | | 32,042.56 | 32,042.56 | 5049 |
| Rent - Office | | 251,240.84 | 251,240.84 | 5050 |
| - Equipment | | 19,020.37 | 19,020.37 | 5051 |
| - Other | | | 0.00 | 5059 |
| Telephone and Telegraph | | 41,206.63 | 41,206.63 | 5060 |
| Utilities - Electricity | | | 0.00 | 5070 |
| - Water | | | 0.00 | 5071 |
| - Other | | | 0.00 | 5079 |
| Office Supplies & Expense - Maint. & Repairs | | 10,049.75 | 10,049.75 | 5080 |
| - Moving&Storage | 1,061.20 | 56,885.82 | 57,947.02 | 5081 |
| - Postage | | 118,272.09 | 118,272.09 | 5082 |
| - Reproduction | | 7,349.18 | 7,349.18 | 5083 |
| - Physical Security | | 8,505.05 | 8,505.05 | 5084 |
| - Shipping/Courier | | 2,265.86 | 2,265.86 | 5085 |
| - Other | | 11,560.98 | 11,560.98 | 5089 |
| Taxes | | 753.50 | 753.50 | 5090 |
| Claims Mailing - Mailing Costs | | 53,453.17 | 53,453.17 | 5100 |
| - Printing | | 23,892.80 | 23,892.80 | 5101 |
| - Publication | | | 0.00 | 5102 |
| - Other | | | 0.00 | 5109 |
| Miscellaneous | | | 0.00 | 5110 |
| **Sub-total General Admin. Disbursements** | **$1,087.17** | **$2,436,688.97** | **$2,437,776.14** | |

_Professional Fees and Expenses_

| | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| Trustee Fees | | 685,237.70 | 685,237.70 | 5200 |
| Trustee Expenses | | | 0.00 | 5201 |
| Trustee Counsel Fees | | 11,040,958.10 | 11,040,958.10 | 5210 |
| Trustee Counsel Expenses | | 939,411.07 | 939,411.07 | 5211 |
| Special Counsel Fees | | 12,967.83 | 12,967.83 | 5212 |
| Special Counsel Expenses | | 4,443.62 | 4,443.62 | 5213 |
| Accountant Fees | 689.00 | 2,857,041.59 | 2,857,730.59 | 5230 |
| Accountant Expenses | | 48.00 | 48.00 | 5231 |
| Consultant Fees | 962.50 | 15,275,888.64 | 15,276,851.14 | 5240 |
| Consultant Expenses | | 14.50 | 14.50 | 5241 |
| Receiver Fees | | | 0.00 | 5250 |
| Receiver Expenses | | | 0.00 | 5251 |
| Receiver Counsel Fees | | | 0.00 | 5260 |
| Receiver Counsel Expenses | | | 0.00 | 5261 |
| **Sub-total Professional Fees and Expenses** | **$1,651.50** | **$30,816,011.05** | **$30,817,662.55** | |
| **Total Administrative Disbursements** | **$2,738.67** | **$33,252,700.02** | **$33,255,438.69** | |

## CASH DISBURSEMENTS:

| Claim Related Disbursements | Net Change for Period | Prior Period Cumulative | Total Paid | Customer Fund | Cumulative Totals — General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| Customer - Paid Bank Loan | | 13,391,274.17 | $13,391,274.17 | $13,391,274.17 | | | 6021 |
| - Securities - Cash in Lieu | | 0.00 | 0.00 | | | | 6022 |
| - Securities - Purchases | | 199,915,714.34 | 199,915,714.34 | 199,915,714.34 | | | 6023 |
| - Securities - Purchases WEBX | | 23,913,655.00 | 23,913,655.00 | 23,913,655.00 | | | 6024 |
| - Indemnification | | 0.00 | 0.00 | 0.00 | | | 6031 |
| - Cash Balance | | 94,593,973.78 | 94,593,973.78 | 94,593,973.78 | | | 6041 |
| - Cash Balance - Transfer Credits | | 335,892,184.38 | 335,892,184.38 | 335,892,184.38 | | | 6042 |
| - Cash Balance - May Mkt Oblig | | 75,402,359.65 | 75,402,359.65 | 75,402,359.65 | | | 6043 |
| - Cash Balance - FDIC Pass Thru | | 53,338,675.52 | 53,338,675.52 | 53,338,675.52 | | | 6050 |
| Customer - Southwest Settlement (All claims) | | 752,022.00 | 752,022.00 | 752,022.00 | | | 6060 |
| Other - Contractual Commitments per Allocation | | | | | | | 6000 |
| General Creditor | | | | | | | 6100 |
| Customer - Trustee Journal Entry per Allocation | 14,799.88 | 37,749,275.83 | 37,764,075.71 | | 37,764,075.71 | | 6200 |
| - Pd. Bank Loan | | | 0.00 | | | | 6111 |
| - Indemnification | | | 0.00 | | | | 6121 |
| - Indemnification | | | 0.00 | | | | 6131 |
| Other - Litigation Disbursement | | 4,835,400.00 | 4,835,400.00 | | 4,835,400.00 | | 6150 |
| Other - Interest on SIPC Advances | | 11,294,487.78 | 11,294,487.78 | | 11,294,487.78 | | 6151 |
| Other - | | 0.00 | 0.00 | | | | 6160 |
| **Sub-total Claim Disbursements** | $14,799.88 | $851,079,022.45 | $851,093,822.33 | $797,199,858.84 | $53,893,963.49 | $0.00 | |
| **Other Disbursements (except Investments)** | | | | | | | |
| SIPC - Refunds - Recoupment | | 32,779,242.39 | 32,779,242.39 | | | 32,779,242.39 | 6301 |
| - Indemnification | | 0.00 | 0.00 | | | 0.00 | 6310 |
| - Contr. Commitments | | 0.00 | 0.00 | | | 0.00 | 6311 |
| - Paid Bank Loan | | 3,699,831.47 | 3,699,831.47 | | | 3,699,831.47 | 6321 |
| - Subrogation | | 164,560,742.56 | 164,560,742.56 | | | 164,560,742.56 | 6322 |
| Other - Mutual Fund Settlements | | 0.00 | 0.00 | | | | 6400 |
| **Sub-total Other Disbursements** | $0.00 | $201,039,816.42 | $201,039,816.42 | $0.00 | $0.00 | $201,039,816.42 | |
| **Sub-total Administrative Disb., page 2** | $2,738.67 | $33,252,700.02 | $33,255,438.69 | | 33,255,438.69 | 0.00 | |
| **Total Disbursements** | $17,538.55 | $1,085,371,538.89 | $1,085,389,077.44 | $797,199,858.84 | $87,149,402.18 | $201,039,816.42 | |
| Investments by Trustee - Purchases | | | | | | | 1900 |
| **Total Receipts less Disbursements** | $70,493.93 | $19,061,135.62 | $19,131,629.55 | $231,638.86 | $18,899,990.69 | $0.00 | |
| **Ending Cash Balance - Trustee Accounts** | $19,131,629.55 | | | | | | |

**Ending Cash Balance less Disbursements　$19,131,629.55**

## SUMMARY INFORMATION ON STATUS OF LIQUIDATION

| | Customer Claimants | Broker/Dealer Claimants | General Estate Claimants |
|---|---|---|---|
| Claims received | 27,005 | | 160 |
| Claims satisfied by distribution of cash and/or securities: | | | |
| a. As part of the transfer in bulk | 25,814 | | |
| b. On an account by account basis | 5 | | 121 |
| Claims under review | 1,186 | | |
| Claims Denied: | | | |
| a. No Claims | 0 | | |
| b. Assets at Another Broker | 561 | | |
| c. Other Denials for which no objections were filed (1) | 72 | | |
| d. Denials for which objections were filed: | 454 | | |
| - Hearing not yet set | | | |
| - Set for Hearing | 99 | | |
| - Adjudicated or otherwise resolved by Trustee | 0 | | |
| Accounts with cash and/or securities which were transferred in bulk | 1,186 | | 20 |
| Filing Date Value | 172,915 | | |
| Customer name securities distributed | $914,767,895.00 | | |
| Customer fund securities distributed | $10,114,944,714.00 | | |
| | $11,029,712,609.00 | | |

(1) includes Denials for:
a. Unauthorized trading at an Introducing Broker
b. Claims for assets that don't appear on the records of the Debtor

Comments:

_____

( *Trustee Signature* )     Nov 22, 2006

_____

(*Date*)

_____

(*Accountant Signature*)

_____

(*Date*)

## SUMMARY INFORMATION ON STATUS OF LIQUIDATION

| | Customer Claimants | Broker/Dealer Claimants | General Estate Claimants |
|---|---|---|---|
| Claims received | 27,005 | | 160 |
| Claims satisfied by distribution of cash and/or securities: | | | |
| a. As part of the transfer in bulk | 25,814 | | |
| b. On an account by account basis | 5 | | 121 |
| Claims under review | 1,186 | | |
| Claims Denied: | 0 | | |
| a. No Claims | | | |
| b. Assets at Another Broker | 561 | | 39 |
| c. Other Denials for which no objections were filed (1) | 72 | | |
| d. Denials for which objections were filed: | 454 | | |
| - Hearing not yet set | | | |
| - Set for Hearing | 0 | | |
| - Adjudicated or otherwise resolved by Trustee | | | |
| Accounts with cash and/or securities which were transferred in bulk | 99 | | |
| Filing Date Value | 172,915 | | |
| Customer name securities distributed | $914,767,895.00 | | |
| Customer fund securities distributed | $10,114,944,714.00 | | |
| | $11,029,712,609.00 | | |

(1) Includes Denials for:
a. Unauthorized trading at an Introducing Broker
b. Claims for assets that don't appear on the records of the Debtor

Comments:

_____
(Trustee Signature)

_____
(Accountant Signature)

_____
(Date)

11/22/06
(Date)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

_____

SECURITIES INVESTOR PROTECTION
  CORPORATION,

                Plaintiff-Applicant,           Adv. Proc. No. 01-4257 RJK

v.

MJK CLEARING, INC.,

                Defendant.

_____

## UNSWORN CERTIFICATE OF SERVICE

      I, Theresa H. Dykoschak, declare under penalty of perjury that on the 22nd day of November, 2006, I served the annexed **Trustee's Investigatory Report, Final Report and Account of Administration of the Estate** and this **Unsworn Certificate of Service** on the persons listed on the attached list by placing a copy thereof in an envelope and arranging for the deposit of same, postage prepaid, in the United States Mails at Minneapolis, Minnesota.

Dated:  November 22, 2006                  /s/   Theresa H. Dykoschak
                                     Theresa H. Dykoschak

# SERVICE LIST

| | |
|---|---|
| Ted S. Meikle<br>Meikle Law Firm<br>90 South 7th St., Suite 4700<br>Minneapolis, MN  55402<br>Phone:  (612) 336-7710<br>Fax:  (612) 339-6686<br>E-mail:  ted@meiklelawfirm.com | MJK Clearing, Inc.<br>c/o Todd Miller<br>Miller Johnson Steichen & Kinnard<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Phone:  (612) 455-5555<br>Fax:  (612) 455-5600 |
| The Stockwalk Group, Inc.<br>James L. Baillie<br>Clinton E. Cutler<br>Fredrikson & Byron<br>Suite 4000<br>200 South Sixth Street<br>Minneapolis, MN  55402-3397<br>Phone:  (612) 347-7000<br>Fax:  (612) 347-7077 | Securities Investor Protection Corporation<br>c/o Ken Caputo<br>805 Fifteenth Street, N.W.<br>Suite 800<br>Washington, D.C.  20005-2207<br>Phone:  (202) 371-8300<br>Fax:  (202) 371-6728 |
| Bryon Bequette<br>MathStar, Inc.<br>5900 Green Oak Drive<br>Minneapolis, MN 55343<br>Phone: (952) 746-2200<br>Fax: (952) 746-2201<br>E-mail: bryon.beqette@mathstar.com | Mark C. McCullough<br>The Colonnade<br>Suite 730<br>5500 Wayzata Boulevard<br>Minneapolis, MN  55416<br>Phone: (763) 545-0833<br>Fax: (763)-545-0834 |
| Henry F. Minnerop, Esq.<br>Sidley Austin Brown & Wood<br>787 Seventh Avenue<br>New York, NY 10019<br>Phone:  (212) 839-5300<br>Fax: (212) 839-5599 | Terence M. Fruth<br>Thomas E. Jamison<br>Fruth, Jamison & Elsass, P.A.<br>3902 IDS Center<br>80 South Eighth Street<br>Minneapolis, MN 55402<br>Phone:  (612) 344-9700<br>Fax:  (612) 344-9705 |

| | |
|---|---|
| Primeshares<br>Attn: Sid J. Garabato<br>60 Madison Ave.<br>2nd Floor<br>New York, NY 10011-1600<br>Phone: (212) 889-5714<br>Facsimile: (212) 889-2232<br>E-mail: ksync@primeshares.com | Wells Fargo Bank, N.A.<br>c/o Mark J. Kalla<br>Bruce A. MacKenzie<br>Dorsey & Whitney LLP<br>Suite 1500<br>50 South Sixth Street<br>Minneapolis, MN 55402-1498<br>Fax: (612) 340-2643<br>E-mail: kalla.mark@dorseylaw.com |
| Mr. James K. Langdon II<br>Dorsey & Whitney LLP<br>Suite 1500<br>50 South Sixth Street<br>Minneapolis, MN 55402-1498<br>Phone: (612) 340-8759<br>Fax: (612) 340-8800<br>E-Mail: langdon.jim@dorseylaw.com | Stephen D. Lerner<br>Squire, Sanders & Dempsey L.L.P.<br>312 Walnut Street<br>Suite 3500<br>Cincinnati, OH 45202<br>Phone: (513) 361-1220<br>Fax: (513) 361-1201<br>E-mail: slerner@ssd.com |
| Sonia U. Chae<br>Securities & Exchange Commission<br>175 W. Jackson Blvd., Suite 900<br>Chicago, IL 60604<br>Phone: (312) 353-7390 | Teri M. Swanson<br>Securities and Exchange Commission<br>100 F Street NE<br>Washington, D.C. 20549<br>Phone: (202) 942-0956<br>Fax: (202) 942-9625 |
| Native Nations Securities, Inc.<br>c/o Proskauer Rose LLP<br>Attn: Michael E. Foreman, Esq.<br>         Peter J.W. Sherwin, Esq.<br>1585 Broadway<br>New York, NY 10036-8299<br>Phone: (212) 969-3000<br>Facsimile: (212) 969-2900 | The Stockwalk Group, Inc.<br>c/o Leonard, Street and Deinard<br>Steven D. DeRuyter<br>Larry B. Ricke<br>150 S. Fifth St., Suite 2300<br>Minneapolis, MN 55402<br>Phone: (612) 335-1500<br>Facsimile: (612) 335-1657 |
| Pax Clearing Corporation<br>c/o Stephen P. Bedell<br>Foley & Lardner<br>321 North Clark, Suite 2800<br>Chicago, IL 60610<br>Phone: (312) 832-4500<br>Facsimile: (312) 832-4700 | Pax Clearing Corporation<br>c/o Paul L. Ratelle<br>Fabyanske, Westra & Hart, P.A.<br>800 LaSalle Ave. #1900<br>Minneapolis, MN 55402<br>Phone: (612) 338-0115<br>Facsimile: (612) 338-3857 |

| | |
|---|---|
| Michael A. Pysno, Esq.<br>RBC Dain Rauscher Incorporated<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Phone: (612) 371-7766<br>Facsimile: (612) 371-7611 | George Vasios<br>Securities & Exchange Commission<br>Midwest Regional Office<br>Attn: Bankruptcy Section<br>175 W. Jackson Blvd.<br>Suite 900<br>Chicago, IL 60604 |
| Peter D. Wolfson, Esq.<br>Holly S. Falkowitz, Esq.<br>Sonnenschein Nath & Rosenthal<br>1221 Avenue of the Americas, 24th Floor<br>New York, NY 10020<br>Phone: (212) 768-6700<br>Facsimile: (212) 768-6800<br>E-mail: pwolfson@sonnenschein.com<br>E-mail: hfalkowitz@sonnenschein.com | Affiliated Financial Services, Inc.<br>c/o Barry L. Wilkie<br>Jones & Keller, P.C.<br>1625 Broadway, Suite 1600<br>Denver, CO 80202<br>Phone: (303) 573-1600<br>Facsimile: (303) 893-6506 |
| E*Trade Securities, LLC<br>c/o William P. Wassweiller<br>Rider Bennett, LLP<br>33 South Sixth Street, Suite 4900<br>Minneapolis, MN 55402-3716<br>Phone: (612) 340-7973 | Joseph D. Dansky<br>Senior Corporate Counsel<br>The BISYS Group, Inc.<br>105 Eisenhower Pkwy<br>Roseland, NJ 07068 |
| Christopher J. Barber<br>Stephen O'Donnell<br>Elissa Isaacs<br>Piper Marbury Rudnick & Wolfe<br>203 North LaSalle Street<br>Suite 1800<br>Chicago, IL 60601-1293<br>Phone: (312) 368-4000<br>Facsimile: (312) 236-7516 | E*Trade Securities Corporation, Inc.<br>c/o Monica L. Clark<br>Dorsey & Whitney LLP<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, MN 55402-1498<br>Telephone: (612) 340-2600<br>Facsimile: (612) 340-2643 |
| E*Trade Securities LLC<br>c/o Edward M. McDonald<br>Christopher P. Hall<br>Neil E. Herman, Esq.<br>Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, NY 10178-0060<br>Telephone: (212) 309-6000<br>Facsimile: (212) 309-6273<br>E-Mail: nherman@morganlewis.com | Stephen M. Case Revocable Trust<br>c/o John C. Thomas, Esq.<br>Todd C. Pearson, Esq.<br>Dorsey & Whitney LLP<br>Suite 1500<br>50 South Sixth Street<br>Minneapolis, MN 55402-1498<br>Telephone: (612) 340-2600<br>Facsimile: (612) 340-2643 |

| | |
|---|---|
| Teresa J. Kimker<br>Halleland Lewis Nilan & Johnson<br>600 U.S. Bank Plaza South<br>220 South Sixth Street<br>Minneapolis, MN 55402-4501<br>Phone: (612) 204-4175<br>E-mail: tkimker@halleland.com | Mr. Richard Kirby<br>Preston Gates Ellis & Rouvelas Meeds LLP<br>1735 New York Ave. NW<br>Suite 500<br>Washington, DC 20006-5209<br>Phone: (202) 628-1700<br>Facsimile: (202) 331-1024 |
| William C. Burnside<br>William C. Burnside & Co., Inc.<br>111 N. Vermillion<br>P.O. Box 507<br>Danville, IL 61834-0507<br>Phone: (217) 443-3310 | E*Trade Securities LLC<br>c/o Richard C. St. John, Esq.<br>Munger, Tolles & Olson LLP<br>355 S. Grand Ave.<br>35th Floor<br>Los Angeles, CA 90071-1560<br>E-Mail: stjohnr@mto.com |
| Mr. David Ebel<br>Schwabe Williamson & Wyatt<br>1420 Fifth Avenue, Suite 3010<br>Seattle, WA 98101<br>Phone: (206) 407-1525<br>E-mail: debel@schwabe.com | |